## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Zachary Bryson, Task Force Officer of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state that:

1.      I am an investigator or law enforcement officer of the United States, within the meaning of Section 2510 (7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Task Force Officer with the FBI. As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) in that I am an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      I have been employed by the Kentucky State Police (KSP) since April 2010. I have been assigned to the FBI as a Task Force Officer (T.F.O.) since September 2017. I am currently assigned to the HIDTA FBI Drug Task Force, which is located in Pikeville, Kentucky.

4.      I have participated in an investigation with law enforcement officials of the FBI HEAT Task Force, and other law enforcement officials that revealed the following information. In conducting the investigation, I have spoken with and reviewed the reports of KSP and other law enforcement officials. The information provided herein is not all of the information that has been uncovered in this investigation, but merely pertinent information necessary and sufficient to support probable cause to believe a federal crime has been committed.

5.     As part of my duties as a Task Force Officer with the FBI., I commonly investigate matters involving federal drug and firearms crimes. However, I have participated in numerous federal investigations that relied heavily on evidence retrieved from electronic devices and servers. I have received law enforcement in-service training regarding proper investigative techniques, particularly in working with computers, the dark web, cellular phones, and social media platforms. I am familiar with the facts set forth herein based on my personal observations or information provided to me by other law enforcement officers and other personnel participating in this investigation. I am also familiar with the facts set forth based on my review of documents, reports, and photographs.

6.     I obtained the information set forth below from consultation with other credible law enforcement personnel, victim and witness statements, and investigative interviews of a Confidential Informant ("CI") and various Sources of Information ("S.O.I."). I have substantiated the information the CI has provided through other witness interviews and documentary support. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

7.     This Affidavit is being submitted in support of a Criminal Complaint alleging that Scott Blair, hereinafter referred to as BLAIR, committed honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346. That statute prohibits a public official from knowingly devising a scheme to fraudulently deprive the public of the right to his honest services through bribery or kickbacks. In order to violate the statute, there must be an intent to defraud the public of this right and a transmission of a wire communication in

furtherance of this scheme. This requires that BLAIR solicited or accepted something of value in exchange for his agreement to perform an official action. *See, e.g., McDonnell v. United States*, 579 U.S. 550, 563 (2016); *Skilling v. United States*, 561 U.S. 358, 411 (2010). An "official action" requires "a formal exercise of governmental power" on a matter that is "'pending' or 'may by law be brought' before a public official." *McDonnell*, 579 U.S. at 574. Use of one's official position to pressure another public official to perform an official act also qualifies. *See id.*

8.     In 2023, KSP and the FBI began investigating BLAIR, the Commonwealth Attorney in Perry County, Kentucky. This investigation was initiated after allegations were raised to law enforcement during a federal proffer interview that BLAIR was using his position of public trust and authority to assist various individuals that were facing criminal matters in Perry County in return for both sexual favors and methamphetamine. As this pattern of criminal behavior was occurring, BLAIR was serving and is still presently the Commonwealth Attorney for the 33rd Judicial Circuit for Perry County, Kentucky.

9.     On or about January 12, 2023, this officer conducted a federal proffer with Cooperator 1 in Somerset, Kentucky. During this interview, Cooperator 1 reported that on one occasion he or she had provided a quantity of methamphetamine to BLAIR and another subject in Hazard, Kentucky. Cooperator 1 advised that this event occurred at Cooperator 1's residence and further estimated that this occurred approximately 1-1 ½ weeks after the initial interaction with the Kentucky State Police which led to Cooperator 1's federal charges. That interaction was documented to have occurred on April 13, 2022. Cooperator 1 advised that at that time he or she provided a half ounce of

methamphetamine to a subject, which was then provided to BLAIR.  Cooperator 1 advised that BLAIR and the other subject arrived at Cooperator 1's residence in a vehicle that Cooperator 1 believed was BLAIR's personal vehicle.  Cooperator 1 advised that he or she only provided methamphetamine that he knew was going to BLAIR on that one occasion.  Cooperator 1 further advised that he suspected that this other subject was having a sexual relationship with BLAIR.

10.     On or about March 09, 2023, this officer conducted a proffer interview with Cooperator 2. During this interview, Cooperator 2 reported that he or she observed numerous Facebook messages between BLAIR and another individual. Cooperator 2 estimated that he or she observed these messages sometime in the late Fall or early Winter months of 2019.

11.     Cooperator 2 advised that after he or she reviewed the Facebook messages it was apparent that BLAIR was messaging this subject for the purpose of obtaining both drugs and sexual favors.

12.     Cooperator 2 further advised that when he or she was reading one of the Facebook messages, it was apparent that BLAIR was requesting to meet the subject for sex.  The subject communicating with BLAIR was requesting consideration regarding pending charges of his former girlfriend, whom Individual 2 believed to be incarcerated and facing pending charges in Perry County, Kentucky.

13.     Cooperator 2 advised that drugs were routinely talked about during the conversations he or she read between BLAIR and the subject. Cooperator 2 stated that BLAIR would ask questions such as, "Can you meet me here?" and "Bring me this?" Cooperator 2 advised that one of the meeting locations he or she observed between BLAIR

and this subject appeared to have occurred at McDonald's, which was located near "Airport Gardens."

14.    Cooperator 2 advised that he or she never discussed or revealed to this subject that he or she had read his or her messages with BLAIR. However, Cooperator 2 provided that this subject "would always make remarks because he felt like he was doing something big because he felt like he had Scott in his pocket."

15.    Cooperator 2 advised that he or she observed the aforementioned Facebook messages when he or she was provided access to the Facebook account by this subject. Additionally, Cooperator 2 advised that he or she was given access to the Facebook account because the subject needed him or her to "message people" in his or her account that owed him or her money because he or she was incarcerated.

16.    Cooperator 2 was asked to recall what he or she remembered about the Facebook accounts he or she observed for BLAIR. Cooperator 2 reported that the account he or she observed had his or her name; however, Cooperator 2 could not recall if the profile had a photograph of the subject. Cooperator 2 said that he or she was sure the profile had BLAIR's name associated with the account because that caught her attention and led to her reading the messages from the Facebook account. Cooperator 2 advised that he or she accessed the subject's Facebook account at the subject's direction and could recall from memory that the subject's account was registered under his or her name and had a profile picture of him or her standing in front of his or her door at his or her residence and further recalled that the subject was wearing a white t-shirt in his or her profile picture and further detailed that you could see him or her wearing an ankle monitor in this Facebook profile picture.

17.    Cooperator 2 advised that after he or she read the Facebook messages mentioned above, he or she obtained screenshot photographs of the communication on his or her Motorola cellular phone, which was subscribed through AT&T. However, Cooperator 2 reported that he or she no longer possesses the cellular phone and does not know where the phone is presently located. Cooperator 2 advised that when he or she captured the screenshots of the communication with BLAIR, he or she did so to gather "dirt" on the Commonwealth Attorney to assist with getting out of jail in the future.

18.    Cooperator 2 detailed that on or about Labor Day weekend of 2022, he or she sold methamphetamine to BLAIR in Lexington, Kentucky. Cooperator 2 further reported that an acquaintance accompanied him or her when this transaction occurred. Cooperator 2 provided that the transaction occurred after BLAIR sent a Facebook message to her associate requesting to purchase methamphetamine. Cooperator 2 advised that on or about the aforementioned date, he or she provided a quarter ounce of methamphetamine to her associate, which was then provided to BLAIR inside his vehicle. Cooperator 2 provided that the transaction occurred in a retail business shopping parking lot in Lexington, KY, and further reported that BLAIR purchased the methamphetamine from his or her associate for $100.00-$125.00. Cooperator 2 reported that his or her primary motivation for conducting the transaction with BLAIR was a belief that it would "do him or her some good down the road."

19.    Cooperator 2 advised that when he or she had her recent interaction with law enforcement, which resulted in a federal investigation, he or she was naïve to the idea that his or her charges would result in prosecution in federal court. Cooperator 2 advised that if the case investigation had remained in state court, he or she intended to remind

BLAIR of the transaction occurring in 2022 and ask BLAIR, "How could he prosecute me when I also sold [BLAIR] dope?"

20.     Cooperator 2 advised that her associate arranged for the transaction to occur when the two subjects stayed in a motel room in Georgetown, Kentucky. Cooperator 2 reported that his or her associate provided that "he or she had someone on their way to Lexington, KY, and needed something." Cooperator 2 stated that during this time, he or she was involved in the large-scale distribution of methamphetamine and was not doing "fifty or hundred-dollar bags anymore." Cooperator 2 provided that since the transaction would be for such a small amount of methamphetamine, he or she informed his or her associate that they would have to deal with whomever the person was on this date. Cooperator 2 then reported that when the associate identified the subject seeking to purchase illegal drugs on this date as "Scott Blair." Individual 2 stated that when he or she discovered that the transaction on this date was to occur with BLAIR, he or she "was all about it and could not get ready fast enough."

21.     Cooperator 2 reported that his or her associate stated BLAIR was traveling to Don Jacob's in Lexington, Kentucky, for automotive repair work on his vehicle. Then afterward, the subjects would conduct the drug transaction. Cooperator 2 advised that they were inside a retail clothing store, suspected to have been Ross when BLAIR messaged her associate and informed him or her that "he was pulling up" at the location. Cooperator 2 reported that they went outside the store and entered his or her vehicle, described as being a Jeep; Cooperator 2 prepared the methamphetamine, provided the methamphetamine to his or her associate, and then his or her associate provided the methamphetamine to BLAIR when he pulled his vehicle next to the subjects. Cooperator

7

2 reported that he or she did not have any form of communication with BLAIR during the transaction. However, Cooperator 2 advised that the methamphetamine that was provided on or about this date to BLAIR had come from his or her supply of methamphetamine, and he or she provided the methamphetamine to his or her associate knowing that the substance would be sold to BLAIR.

22.     On June 13, 2023, this officer, T.F.O. Joshua Richardson, and Trooper Matthew Day contacted an individual known to this officer, hereinafter referred to as Cooperator 3, at his or her Perry County, KY residence. I informed Cooperator 3 of the identity of the interviewing officers and requested the subject to speak to me regarding this on-going investigation.

23.     Cooperator 3 estimated that he or she had known BLAIR since the late 1990s. Cooperator 3 stated that during this time frame, he or she would provide cocaine for BLAIR and further detailed that this was before the epidemic of methamphetamine was occurring in Perry County, Kentucky.

24.     Cooperator 3 advised that he or she has used his or her relationship with BLAIR to assist in reducing or mitigating the charges and/or the period of detention for three (3) separate and different subjects.

25.     Cooperator 3 advised that Subject A was facing charges in Taylor County, KY. Individual 3 advised that Subject A was facing several criminal charges and further elaborated that Subject A had been evading law enforcement for a period of time. Individual 3 advised that he or she contacted BLAIR via Facebook Messenger with the anticipation that BLAIR would assist Subject A with minimizing his or her degree of trouble in Taylor County. Shortly thereafter, Cooperator 3 reported that Subject A was

released from custody. Cooperator 3 advised that he or she compensated BLAIR approximately one eight ball of methamphetamine for assisting Subject A in Taylor County. Cooperator 3 advised that he or she met BLAIR at a carwash in Hazard, Kentucky, and provided the methamphetamine to BLAIR at this location.

26.    Cooperator 3 further stated that he or she had requested BLAIR to assist with another individual who was also facing pending criminal charges named Subject B. Cooperator 3 advised that Subject B faced several criminal charges in Perry County, KY. Cooperator 3 advised that he or she initially contacted BLAIR via Facebook Messenger and later informed BLAIR that he or she "needed him or her out." Cooperator 3 advised that because of BLAIR's influence and assistance, Subject B received a probated sentence and was later released. Cooperator 3 further reported that he or she provided a quarter ounce of methamphetamine to BLAIR for his assistance with reducing or mitigating Subject B's period of incarceration. Cooperator 3 advised that he or she provided the methamphetamine to BLAIR at the same car wash location which was previously described.

27.    Cooperator 3 provided that the last individual he or she requested BLAIR to assist with pending charges in Perry County was Subject C. Cooperator 3 advised that Subject C was facing a possible pending jail sentence of 10-15 years for various felony charges. Furthermore, Cooperator 3 advised that Subject C was one of his or her "best friends," and he or she strongly desired him or her to receive a reduced or mitigated sentence. Cooperator 3 stated that he or she provided BLAIR approximately 14 grams of methamphetamine; in return, BLAIR probated Subject C's charges and "sent him or her

to a long-term rehab clinic." Cooperator 3 advised that this conversation occurred with BLAIR between the estimated timeframe of March, April, May, or June of 2020.

28.     In an effort to corroborate Cooperator 3's allegations, this officer reviewed KY CourtNet records for Subject C. As a result, it was determined that Subject C was granted Shock Probation on July 09, 2020 for three (3) separate and different pending criminal cases, which were pending in Perry County, KY. Subject C was granted Shock Probation for the following Perry County Court Case Numbers: 16-CR-00161, 18-CR-00058 and 18-CR-00064-001. Additionally, it was determined that on or about July 29, 2020, Subject C was mandated by the court to attend the Cumberland Hope Center on July 29, 2020.

29.     Moreover, this officer reviewed a Motion for Shock Probation, which was filed by Subject C's appointed counsel. In this motion the defendant's attorney also corroborated what Individual 3 advised, stating that Subject C "had been incarcerated under terms combined into a fifteen-year total sentence for more than thirty (30) days but less than 180 days prior to filing this motion." Court records for Subject C are almost entirely consistent with Individual 3's statement.

30.     In an effort to further substantiate Individual 3's allegations, this officer reviewed KY CourtNet records for Subject A. As a result, it was determined that Subject A was granted Probation on July 14, 2020, for a pending Trafficking 1st Degree Methamphetamine and Drug Paraphernalia criminal case, which was pending in Perry County, KY. A further review of KY CourtNet records revealed that Subject A received a suspended 5 years sentence for Trafficking 1st Degree Methamphetamine greater than or equal to two grams and was also sentenced to 5 years of supervised probation

31.     After initially providing the above information to law enforcement, Cooperator 3 stated that he or she could corroborate his or her statements. Cooperator 3 advised that he or she had numerous Facebook Messenger messages stored inside his or her Facebook Messenger app, which he or she would freely display to law enforcement. Cooperator 3 stated that the messages on his or her personal cellular phone would clearly display that he or she has communicated with BLAIR on numerous occasions and would reveal that he or she has been honest with law enforcement regarding all of these statements.

32.     This officer reviewed the Facebook messages in the presence of Cooperator 3 and T.F.O. Richardson. Furthermore, this officer obtained Cooperator 3's permission and consent to photograph the aforementioned messages from Facebook.

33.     On or about this same date, Cooperator 3 produced his or her cellular phone from his or her pants pocket and allowed law enforcement to review and photograph all messages that were still visible and recorded with BLAIR. An investigative review of BLAIR's Facebook profile revealed that the profile picture displayed on STAMPERS message(s) was displaying the same profile picture that was being utilized on BLAIR's present-day profile picture.

34.     This officer reviewed a Facebook message between Cooperator 3 and BLAIR, which was documented on Facebook to have occurred on June 16, 2020. This officer photographed the message, and the image is viewable on the following pages of this Affidavit. A review of the message indicated that Cooperator 3 requested BLAIR to help Subject B. STAMPER provided a court location and the exact time that Subject B was assigned to appear. STAMPER then said, "It would be greatly appreciate to ya when

we get back in town." As the conversation developed, the message revealed that BLAIR asked Cooperator 3 "how court went today in Taylor County" and then confirmed to Cooperator 3 that he attempted to help Subject B. BLAIR advised when asked if he helped, "I don't know. I hope. I did send a message, but I didn't hear back. Hopefully, it helped." BLAIR then asked of Cooperator 3, "You out and about tonight?"





14



35.    Additionally, regarding Subject A the following message(s) are depicted below on the following pages. The messages were retrieved from Facebook Messenger conversations that occurred between Cooperator 3 and BLAIR.

36.    Reviewing the message(s) revealed that Cooperator 3 communicated with BLAIR regarding Subject A's criminal activity. Additionally, the message(s) revealed that BLAIR was willing to discuss topics of a sexually inappropriate nature with Individual 3. In this message, BLAIR advised that he would "pay good money for someone to get naked with."  This message was also significant because Individual 3 informed BLAIR that he or she was "making it pretty good being an ice cream man."  As a K.S.P. Detective assigned to the Drug Enforcement Special Investigations Section, this officer can attest

through numerous training and first-hand experiences that I know nicknames such as ice cream, ice, and cream to represent slang terminologies that are commonly utilized when referencing methamphetamine. BLAIR was seen to have responded, "You can have the ice cream, I just want a nice big cone! Lol!"





37.     A further review of the Facebook Messenger message(s) between Individual 3 and BLAIR revealed that on or about April 25, 2020, at approximately 5:50, Individual 3 asked BLAIR, "If he liked his new job?" BLAIR responded to this question by saying, "Yah I do." Cooperator 3 was then seen to have asked BLAIR, "Can't you help me when I get in there?" To which BLAIR responded, then appeared to "unsent a message" and responded by saying "Yeah," to Cooperator 3's response of "I bet now you can?" Lastly, Individual 3 asked BLAIR, "Why me all of a sudden?" BLAIR responded, "I just got up the nerve to hint." The message then revealed that Cooperator 3 had written BLAIR a letter on one occasion when BLAIR had relocated to California. A review of BLAIR's Facebook page revealed that BLAIR listed in his "About Me" Section that he was employed as a Former Real Estate Agent/Broker at Scott Anastasi Realty from October 2005-April 2011 in Redondo Beach, California.



38.    Further review of the message(s) between Cooperator 3 and BLAIR

revealed that on or about June 09, 2020, BLAIR provided the following cellular phone

number to Individual 3, which was reported by BLAIR as follows: "223 0033."  This

telephone number  was  provided  to  a  K.S.P.  Intel  Analyst,  and  through  various

investigative means, the telephone number was determined to be registered and assigned

to BLAIR. It should also be noted that the residential address associated with the telephone

number is also the same one associated with BLAIR's "Kentucky Operator's License."



39.     A review of the Facebook messages revealed that BLAIR and Cooperator 3

only communicated via Facebook Messenger on two occasions before April 25, 2020. The

bulk of the communication occurred between on or about April 25, 2020, through

approximately June 28, 2020.

40.    Furthermore, it should be noted that BLAIR "unsent" approximately twenty (20) separate messages, which were originally sent to Cooperator 3. When this officer asked Cooperator 3 why BLAIR would routinely "unsend a message." Cooperator 3 confirmed that it was because the topic of conversation was usually related to a discussion of illegal narcotics.

41.    Lastly, Cooperator 3 described to this officer an incident in which he or she felt that Blair was warning him about a potential law enforcement investigation into Cooperator 3. Cooperator 3 stated that on one occasion, BLAIR had cautioned that law enforcement might be investigating him or her and that during this conversation, BLAIR told him that, "Things were getting hot…" Cooperator 3 advised that he or she responded to this statement by asking BLAIR, "Who is coming after me?" To which BLAIR informed him that, "All of them are coming for you." Cooperator 3 advised that he compensated BLAIR with a quantity of methamphetamine for providing him with this information.

42.    On or about Monday, June 19, 2023, this officer re-contacted Cooperator 3 regarding this investigation. This officer asked Cooperator 3 to reexamine the messages, which were being stored inside his Facebook Messenger app, and to report and screenshot which profile picture was being associated with BLAIR's Facebook profile on this date. A further review of the messages by Cooperator 3 revealed that the same profile picture associated with the messages was the same profile picture associated with his present-day Facebook page.

43.    K.S.P. Intel reported that a query search was conducted for all e-mail addresses associated with BLAIR on an intelligence search program named T.L.O.

Additionally, K.S.P. Intel confirmed that through the use of the Social Media Search on

T.L.O., K.S.P. Intel confirmed that the same account that was associated with BLAIR was

the same account that is associated with BLAIR using the Facebook Profile URL. K.S.P.

Intel reported that the Facebook Profile URL for BLAIR is identified and listed as being

(https://www.facebook.com/scott.blair.1004.)

44.     On July 19, 2023, this officer conducted a proffer interview with Cooperator

4. The identity of the interviewing officer was provided to Cooperator 4 and the following

details were provided to this officer.

45.     Cooperator 4 advised that he or she has only known BLAIR since he

(BLAIR) has been in his official position as the Commonwealth or Prosecuting Attorney

in Perry County, KY.  Cooperator 4 advised that they established their relationship and

solely communicated via Facebook Messenger.  Cooperator 4 reported that he or she was

initially cautious of the messages from the account of a prosecutor.  Cooperator 4 provided

that he or she had seen BLAIR in the courtroom on previous instances but had never

communicated before the Facebook Messenger messages.  Cooperator 4 stated that

initially BLAIR was making basic communication with him or her then the conversations

led to BLAIR asking him or her, "If he or she knew anybody that gets high?" Cooperator

4 stated that for the longest time he or she never entertained BLAIR's questions related to

drugs.  However, Cooperator 4 advised that he or she encountered a time period in his or

her life where he or she desperately needed money and agreed to sell BLAIR a quantity

of methamphetamine.

46.     Cooperator 4 advised that he or she has sold methamphetamine to BLAIR

on at least fifteen (15) separate and different occasions in 2021.  Cooperator 4 advised that

the majority of the transactions occurred inside BLAIR's residence, which is located on Cornell Street, in downtown Hazard. Cooperator 4 advised that he or she weighed and sold the methamphetamine to BLAIR inside BLAIR's residence. Cooperator 4 stated that BLAIR commonly used the methamphetamine in front of him or her and further detailed that he or she has observed BLAIR snort methamphetamine. Cooperator 4 advised that he or she has sold BLAIR anywhere from twenty-dollar quantities of methamphetamine up to an eight-ball quantity of methamphetamine.

47. Cooperator 4 confirmed that his or her motivation for selling methamphetamine to BLAIR was an expectation that he would receive a lesser criminal sentence from BLAIR if he ever got in trouble again in Perry County, KY. Cooperator 4 advised that on one occasion, he even asked BLAIR if he would help him or her if he or she ever got in trouble and BLAIR responded, "I can't make you any promises, but you're one of my favorites and we'll see."

48. On December 19, 2023, this officer conducted a proffer interview with an individual hereinafter referred to as Cooperator 5. Cooperator 5 was informed of the identity of the interviewing officer, and the subject provided the following information.

49. Cooperator 5 provided during this proffer that he or she had knowledge of criminal activity that was being conducted by Scott Blair, the Commonwealth Attorney of Perry County, Kentucky.

50. Cooperator 5 advised that he or she accompanied Cooperator 3, on at least two separate occasions when Cooperator 3 provided suspected methamphetamine to BLAIR. Cooperator 5 further provided that the transactions occurred at the "car wash on top of the hill." Cooperator 5 stated that he observed Cooperator 3 place the suspected

23

methamphetamine near the windshield area of a black Mercedes passenger vehicle that BLAIR was allegedly driving.

51.     Cooperator 5 estimated that Cooperator 3 provided one to two eight balls (approximately 3.5 grams) of methamphetamine to BLAIR during each of the transactions.  Cooperator 5 reported that he never observed BLAIR at the transaction location.  However, Cooperator 5 clarified that while he never positively identified BLAIR at the transaction location, it was still his suspicion that the transaction was being conducted with BLAIR because Cooperator 3 told him that he was selling drugs to BLAIR before each of these particular transactions occurred.

52.     Cooperator 5 advised that in August 2020, he or she was arrested with Cooperator 3 while at Individual 3's residence in Perry County, Kentucky.  Cooperator 5 advised that after we were arrested, BLAIR blocked Cooperator 3 on Facebook. Cooperator 5 stated that Cooperator 3 informed him or her that if he or she took the blame for all illegal items seized during their arrest, he or she would have, "Scott give you three years and probate it."  Cooperator 5 advised that during this arrest, law enforcement seized two (2) or three (3) firearms, one (1) stolen motorcycle, and one (1) stolen police scanner. Cooperator 5 advised that neither subject was indicted, and the charges were dismissed. Cooperator 5 advised that Cooperator 3 boasted, I'll tell BLAIR, "If we get in trouble, I'll show the video of him (BLAIR) buying drugs from me."

53.     Lastly, Cooperator 5 advised that he was also aware of a female subject that had also observed numerous Facebook messages between BLAIR and Cooperator 3. Cooperator 5 suspected that the female subject viewed these messages, on one occasion while accessing Cooperator 3's Facebook profile.

54.     On or about July 24, 2023, this officer obtained a federal search warrant for Facebook Profile URL: https://www.facebook.com/scott.blair.1004, associated with Facebook Screen/User Name: Scott Blair. That warrant authorized the return of Facebook records associated with BLAIR'S account from April 25, 2020 to September 04, 2022.

55.     In or about September 2023, this officer received records that were produced by Meta in response to the Search Warrant that was delivered and received by Meta on July 26, 2023.

56.     The records included search results for Basic Subscriber Information, IP Address Logs, Messages, Photos, Transactional Information, Videos, Other Content and records for the account with identifier 740117319.

57.     The records provided are an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta. The records were saved in electronic format after searching Meta's automated systems in accordance with the above-specified legal process. The records were made at or near the time the information was transmitted by the Meta user.

58.     A review of the records obtained from the warrant revealed numerous Facebook messages which indicated that BLAIR, while serving as the elected Commonwealth Attorney of Perry County, Kentucky, used his position of public trust and authority to assist various individuals who were facing criminal matters in Perry County. Numerous instances were located in which BLAIR requested something of value, including sexual favors and methamphetamine, from multiple individuals in exchange for taking actions in his official capacity to help those individuals.

59.    At all relevant times, when this pattern of behavior was occurring, BLAIR was serving as the Commonwealth Attorney for the 33rd Judicial Circuit in the Commonwealth of Kentucky. As Commonwealth Attorney, BLAIR was an agent of the Commonwealth of Kentucky and was responsible for the just administration of the Commonwealth's criminal laws. BLAIR's responsibilities included and still presently include the prosecution of criminal offenses within the 33rd Judicial Circuit; that is, Perry County.

60.    In or about February of 2021, BLAIR communicated with an individual who was presently in service of a term of probation for a prior convicted felony offense that was committed and prosecuted in the 33rd District.  This individual will hereinafter be referred to as, VICTIM 1.

61.    At all relevant times, VICTIM 1, whose identity is known by this officer, was a resident of Perry County, Kentucky.

62.    At various relevant times, VICTIM 1 was charged with criminal offenses within the 33rd Judicial Circuit, including the following:  On or about July 17, 2015, VICTIM 1 was charged in Perry Circuit Court with a violation of K.R.S. 511.030 (Burglary 2nd Degree), a Class C felony offense (hereinafter, "Case A"). VICTIM 1 agreed to plead guilty in Case A, and on or about November 15, 2016, the Perry Circuit Court entered a judgment finding VICTIM 1 guilty.

63.    Thereafter, VICTIM 1 was sentenced to a suspended prison sentence of 7 years and was also mandated to complete a period of probation for 5 years.  VICTIM 1 remained subject to the jurisdiction of the Perry Circuit Court, including that VICTIM 1 would abide by certain release conditions such as community service and drug screenings

and that VICTIM 1 would make appearances in court as ordered, and was subject to potential additional incarceration for violations of the Circuit Court's conditions and orders.

64.    A review of the records obtained by this officer indicated that BLAIR initially began communicating with VICTIM 1 in or about February of 2021 and continued this line of communication through and until October 2021.

65.    During this time frame of communication, it was apparent that BLAIR attempted to coerce VICTIM 1 to engage in a sexual relationship on numerous occasions.

66.    On or about April 18, 2021, VICTIM 1 messaged BLAIR and said, "Hey I think I messed up and missed a court date downstairs is there any way to find out today?" BLAIR responded to VICTIM 1 by saying, "Yeah. When I get home, I'll check don't let me forget." VICTIM 1 then informed BLAIR that he or she was presently on probation and feared that he or she had missed a virtual zoom meeting. The messages then indicated that VICTIM 1 provided BLAIR with his or her full name, date of birth, and social security number so that BLAIR could utilize a program suspected to have been either COURTNET or E-WARRANT to determine if VICTIM 1 had an active bench warrant.

67.    On or about April 19, 2021, BLAIR sent a Facebook message to VICTIM 1 which stated, "I see no bench warrants for you in Perry county." VICTIM 1 responded by saying, "Awesome did I not miss court." To which BLAIR responded, "It didn't say. Now it is within the realm of possibility that it hasn't been entered into the system yet but probably not. I will call the clerks office if I were you tomorrow just to make sure don't ask him if you got a bench warrant just ask him when your next court is." BLAIR then

stated, "You now officially owe me some dick. Lol" VICTIM 1 responded by saying, "Bet…I got you."

68. On or about June 1, 2021, BLAIR informed VICTIM 1 that he had communicated with his probation officer and informed the probation officer that, "you was doing good."

69. On or about July 10, 2021, VICTIM 1 messaged BLAIR and informed BLAIR of matters related to his or her on-going divorce. VICTIM 1 referenced being stressed and stated, "Shit I can't wait my blood pressure is going down and everything seriously. To which BLAIR responded, "I bet it would go down even more if your cock was buried deep in my ass."

70. On July 12, 2021, BLAIR messaged VICTIM 1 and stated, "Ok. I was going to see if you wanted to fuck." VICTIM 1 responded in a line of messages stressing concerns to BLAIR that he or she was worried about having communication difficulties with his or her attorney regarding an upcoming court date. VICTIM 1 further informed BLAIR that he or she felt like "I'm walking into a trap in the morning." To which BLAIR responded, "I'm sure you're not…I'll tell Jason (probation officer) that you contacted me."

71. On or about July 12, 2021, BLAIR was again observed in a chain of messages to VICTIM 1 wherein it was apparent that he (BLAIR) utilized a program such as COURTNET or E-WARRANT to confirm if VICTIM 1 had an active bench warrant. The message revealed that BLAIR again obtained VICTIM 1's date or birth and social security number and confirmed to VICTIM 1, "You do have an active bench warrant for

a TBUT case." Then BLAIR was immediately seen to have asked VICTIM 1, "Want to come fuck me? Please"

72.     After learning of an active bench warrant, VICTIM 1 was seen to express multiple messages of frustrations to BLAIR. VICTIM 1 expressed to BLAIR that he or she intended to go ahead and turn themselves in for the active bench warrant. To which BLAIR was seen to have responded, "At least get a fuck in before you go." BLAIR then later directed VICTIM 1 to "Just go see Jason (probation officer) and explain it to him tomorrow."

73.     VICTIM 1 then messaged BLAIR and stated, "He is cool but with that bench warrant he [probation officer] has to take me and I'd rather turn myself in tonight and get in the system, I'll text Jason [probation officer] tonight and tell him I'll be in jail. But let me make some calls." BLAIR then responded, "So you are or are not coming over? VICTIM 1 responded, "Ya I just got to call my mom and explain everything and try and round up some money because with my luck I'll get a pv [probation violation] and sent to do my time. To which BLAIR responded, "I wont PV you." It appears that VICTIM 1 clearly understood what BLAIR meant by the offer to not violate VICTIM 1's probation, because VICTIM 1 responded, "Look don't compromise yourself on anybody especially these days."

74.     On or about July 14, 2021, BLAIR was seen to have messaged VICTIM 1 and said, "I'm at Meemaw's. I'll message you when home. I washed your clothes."

75.     On or about August 20, 2021, VICTIM 1 messaged BLAIR and advised BLAIR that he or she has an upcoming pre-trial conference on August 28. VICTIM 1 was seen to be extremely worried in this chain of messages, at one point even revealing to

BLAIR a consideration of fleeing in fear of being revoked and forced to serve 7 years of incarceration from CASE A.

76. On or about September 27, 2021, VICTIM 1 messaged BLAIR and said, "Good god I am absolutely freaking out all day long again today I can't get my lawyer to call me back. I feel like I'm walking into a firing squad tomorrow."

77. On or about September 28, 2021, VICTIM 1 messaged BLAIR and stated, "Court went great." To this statement BLAIR responded, "You should know I watch out for you I told you... I can't always say stuff on here as you know. VICTIM 1 then responded by saying, "I owe you big time."

78. A review of relevant court dockets revealed that VICTIM 1 was serving a term of supervised probation for a 2015 felony case at the time the above conversations occurred. Consistent with the conversation, in or about June of 2021 a failure to appear warrant was issued for VICTIM 1 in a separate misdemeanor case. This officer knows that, as the Commonwealth Attorney of Perry County, BLAIR would have been the prosecutor of record in Circuit Court in 2021, and was responsible for representing the Commonwealth in felony matters, including matters involving probation violations. A further review of the dockets revealed that, consistent with the above conversation, VICTIM 1 had a pretrial conference in the misdemeanor case on or about September 28, 2021. Additionally, the records as to the relevant circuit court case, in which BLAIR would have represented the Commonwealth, reveal that VICTIM 1's probation was never violated or revoked.

79. In or about March of 2022, BLAIR communicated with an individual who was presently in service of a term of probation for a prior convicted criminal matter that

was committed and prosecuted in Letcher County, Kentucky. This individual will hereinafter be referred to as, VICTIM 2.

80.    At various relevant times, VICTIM 2 was charged with criminal offenses within Letcher County, Kentucky, including the following: On or about April 08, 2021, VICTIM 2 was charged in Letcher District Court (21-M-00133) with a violation of K.R.S. 508.030 (Assault 4th Degree Domestic Violence, Minor Injury), a Class A misdemeanor offense (hereinafter, "Case B"). VICTIM 2 agreed to plead guilty in Case B, and on or about April 21, 2021, the Letcher District Court entered a judgment finding VICTIM 2 guilty.

81.    Thereafter, VICTIM 2 was sentenced to a suspended prison sentence of 12 months and was also mandated to complete a period of probation for 2 years. VICTIM 2 remained subject to the jurisdiction of the Letcher District Court, including that VICTIM 2 would abide by certain release conditions and was subject to potential additional incarceration for violations of the District Court's conditions and orders.

82.    A review of the records obtained by this officer indicated that BLAIR initially began communicating with VICTIM 2 in or about March of 2022 and continued this line of communication through and until June of 2022.

83.    On or about March 05, 2022, BLAIR and VICTIM 2 communicated about meeting for a sexual interaction. During this interaction VICTIM 2 stated, "Really no shit I do need legal help lmao.... I need cocked as well...yeah that's fine." BLAIR then sent a message requesting to meet at 1am. BLAIR then messaged that he would message VICTIM 2 at approximately 12 or 1230. BLAIR then informed VICTIM 2, "I can't drive

tonight. Can you hang tomorrow?" Further insisting a promise that, "I'll come and bring stuff."

84.     VICTIM 2 advised BLAIR that, "I'll send u pic n get ya ready lol ttyl...." The messages then revealed that the two subjects exchanged sexually explicit images of each other.

85.     On or about April 05, 2022, BLAIR and VICTIM 2 were again observed to have communicated about arranging a meeting location for a sexual interaction. BLAIR informed VICTIM 2 that he could be available to meet at approximately 8:30. To which, VICTIM 2 responded "Sure thing 8:30 good I'll suck u at quarter till nine." Additionally, BLAIR informed VICTIM 2, "I have some clear. Do you like that?" VICTIM 2 replied by saying, "U goddamn right i do."

86.     It should be noted that this officer is presently assigned to the HIDTA FBI Drug Task Force, which is located in Pikeville, KY. As an officer routinely involved in the investigation of illicit drug investigations, I commonly hear slang drug terminology. When BLAIR referenced the word "clear" it should be emphasized that I know this slang terminology to represent methamphetamine.

87.     On April 08, 2022, BLAIR sent a message which stated, "Hey man, what's up? I'm really wanting to kick it with you but I'm just nervous about everything. VICTIM 2 responded by saying, "Hey bro, I understand totally my friend!!! I respect that, u are a professional figure n u have to keep it real lol... I really do know what you saying.... I got court in morning, hope they will throw it out, and I can get off this house arrest...

88.     On or about this same date, BLAIR then requested from VICTIM 2 to know what his or her pending charges were in Letcher County, Kentucky.  BLAIR informed

VICTIM 2 that he (BLAIR) would provide advice to VICTIM 2 and then proceeded to obtain the full name and date of birth for VICTIM 2, so that a search of VICTIM 2 could be conducted on CourtNet. BLAIR provided to VICTIM 2 that, "I'll look at it here in a few and get back to you."

89.     In regard to this statement, VICTIM 2 then stated, "Ok study on it and if u can help me, I'll suck that cock for 24 straight hours." BLAIR then replied by saying, "If they're too rough we'll move you over here and I guarantee you won't be bothered. BLAIR then added, "I'm wanting to suck your cock and eat and tongue fuck that hot ass of yours. Hell, I'll move you in with me. lol."

90.     On or about March 08, 2022, a message was observed between BLAIR and VICTIM 2 regarding VICTIM 2's appointed legal counsel. During this message VICTIM 2 informed BLAIR that his or her appointed legal counsel was Bill Melton. The message further revealed that BLAIR informed VICTIM 2 that, "I'm (BLAIR) on it. I've got a call into Bill Melton and I will tell you some more info when I talk to you." To this statement VICTIM 2 responded to BLAIR by saying, "Awesome thanks my bro!!! You're the best!! Give u the best sex ever."

91.     On March 08, 2022, a message was reviewed between BLAIR and the legal counsel for VICTIM 2 in a pending case in Letcher County, Kentucky. The message revealed that BLAIR contacted Melton and asked, "just a quick question...do you represent [VICTIM 2]?" Melton responded by saying, "I have [VICTIM 2] on some district court stuff. But [VICTIM 2] is indicted and [ATTORNEY 2] will have [VICTIM 2] on that. Mine is an DVO violation. [ATTORNEY 2's] is a Criminal Mischief." BLAIR

then asked ATTORNEY 1 if he believed that Judge Prater (Letcher County Judge) would revoke the probation of VICTIM 2.

92.   On or about March 09, 2022, a message was reviewed between BLAIR and VICTIM 2 regarding the on-going court proceeding in Letcher County.  In this message BLAIR advised VICTIM 2, "Ok. Now, we need to get you through the probation revocation. That's my main worry. We'll talk about that though."  To this statement VICTIM 2 responded by saying, "Ok bro I appreciate it..... dude tell prater (Letcher District Court Judge) I've never been in trouble in my life until I moved in with her 2018....a speeding ticket I think lol. She's still harassin me 3-4 time week coming here n I've tried get harassment, trespassing, civil epo, but no they just act like I'm some fucking idiot. I respect everyone and anything they own, never done anything to hurt that car. She also acted like grandbaby was running a fever so high I needed to come get meds n I had no license, got to McDonald's intersection, blue lights. Cop said u ain't got license [VICTIM 2], how the hell u know?? Well I was set up he told year later."

93.   In or about March of 2021, BLAIR communicated with an individual who was presently being charged in Perry County District Court which is located in the 33rd District.  This individual will hereinafter be referred to as, VICTIM 3.

94.   At various relevant times, VICTIM 3 was charged with criminal offenses within the 33rd Judicial Circuit, including the following:  On or about June 06, 2020, VICTIM 3 was charged in Perry District Court (20-M-00266) with a violation of K.R.S. 525.100 (Public Intoxication Controlled Substance Excludes Alcohol), a Class B misdemeanor offense (hereinafter, "Case C").

95.     In or about March of 2021, numerous messages were observed between VICTIM 3 and BLAIR.  During one such communication, VICTIM 3 requested a favor from BLAIR and asked, "Do me a favor look to see if i have a bench warrant in district I think i had court today."  BLAIR was then seen to have requested VICTIM 3 to provide his or her birthday.  The message then revealed that BLAIR informed VICTIM 3 that he or she did not have a warrant as BLAIR advised, "I don't see one."

96.     VICTIM 3 was then observed to have informed BLAIR that "he was good if you need."  The statement in this officers' training and experience was interpreted as VICTIM 3 informing BLAIR that he or she had illegal narcotics that were available for BLAIR to purchase.

97.     On or about March 31, 2021, VICTIM 3 was seen to have communicated with BLAIR.  VICTIM 3 sent a message to BLAIR which advised, "Hey they said the cops were on combs st last night looking for me…you said I didn't have a bench warrant, right?"  To this BLAIR responded, "I didn't see one unless it wasn't entered in yet."  BLAIR was then asked by VICTIM 3 to check again on the status of active bench warrant and BLAIR was seen to have informed VICTIM 3 that, "Yes, it's in there now for fta (commonly known by law enforcement as a failure to appear arrest warrant) 3/29/21."  This bench warrant corresponds with the information associated with CASE 3.

98.     A review of the messages between VICTIM 3 and BLAIR revealed numerous conversations wherein drugs were discussed by the two subjects.  Through this officers training and experience in narcotics investigations, it was very apparent that VICTIM 3 was a source of supply for BLAIR, when BLAIR was seeking to purchase methamphetamine.  In the messages between VICTIM 3 and BLAIR, this officer observed

BLAIR being solicited to purchase methamphetamine and also observed BLAIR attempt to purchase suspected methamphetamine from VICTIM 3.

99.     On or about April 01, 2021, VICTIM 3 was seen to have messaged BLAIR and informed the subject, "Hey bro I got sum really good atm OMG horny dope like u wouldn't believe bro...U got to try this shit it's awesome!"

100.    On or about April 04, 2021, VICTIM 3 again messaged BLAIR and provided, "I'm good, if you need?" BLAIR responded by saying, "Ok, I might give you a yell in a while." VICTIM 3 then informed BLAIR, "I got really good right now." To this statement BLAIR replied, "Ok. I will probably do like a 40. Is it really good no kidding?" The two subjects were then seen to have discussed a meeting location for the exchange.

101.    On or about April 06, 2021, BLAIR was seen to have messaged VICTIM 3 and informed the subject that he (BLAIR) was presently, "at work but getting ready to leave soon." To this statement VICTIM 3 was seen to have asked BLAIR "how much u wanting to spend? BLAIR was then seen to have responded, "70ish. Is it that same stuff though?" VICTIM 3 responded by saying, "gram."

102.    On April 07, 2021, VICTIM 3 was seen to have messaged BLAIR and said, "got fire bro...what I got now is really good." BLAIR responded by asking VICTIM 3 his present location and also asking how long it would take VICTIM 3 to meet him (BLAIR). VICTIM 3 later informed BLAIR that, "Hey, I'm coming, my partner is just now weighing it out, u can come to me if u like it would be faster."

103.    It should be emphasized that this officer recognized "fire" as being a common street reference for methamphetamine. I have personally been involved in

numerous narcotics investigations wherein "fire" has been referenced and known to represent methamphetamine.

104.   A review of the relevant court dockets revealed that VICTIM 3 was charged with a misdemeanor in Perry County on June 6, 2020. Consistent with the above conversation, on or about March 29 2021, a failure to appear warrant was issued for VICTIM 3 in this same misdemeanor case. BLAIR was serving as the Commonwealth Attorney during this time period, and by virtue of his position, would have had access to a service by which to determine if an individual had active warrants.

105.   On or about March 25, 2024, this officer received information from the Kentucky Attorney General's Office that a telephonic complaint had been received from an individual referred herein as VICTIM 4 regarding allegations of misconduct by BLAIR.

106.   During this recorded complaint, VICTIM 4, an inmate at the Kentucky River Regional Jail, reported that he or she had a complaint to file against the Commonwealth Attorney in Perry County, later identified in the complaint as BLAIR.

107.   VICTIM 4 reported that due to his relationship with BLAIR, he was persuaded to take a plea bargain on a case, which was allegedly being adjudicated in the 33rd Judicial District.  VICTIM 4 further revealed that BLAIR informed VICTIM 4 "that everything would be okay as long as VICTIM 4 did what he (BLAIR) told him too."

108.   VICTIM 4 stated that "he (BLAIR) had me go pick his drugs up for him and would bring me into his house, just different things that were not right."

109.   VICTIM 4 further provided that he recorded interactions with BLAIR on his or her cellular phone and has both audio and video proof of BLAIR "getting high." VICTIM 4 further advised that he has this evidence available on an SD Card.

110.   VICTIM 4 stated that BLAIR has numerous people presently assigned to "drug court" which he is presently "blackmailing just like [VICTIM 4] to do things for him."

111.   VICTIM 4 advised that this type of relationship was occurring with BLAIR up until the point that VICTIM 4 finally refused to assist BLAIR.   VICTIM 4 stated that after he or she refused to assist BLAIR any further, "he (BLAIR) had me thrown in jail."

112.   VICTIM 4 characterized BLAIR as being someone "that catches people struggling in life, having a hard time with hardly no family out there to help them and he gets them in a bind and blackmail's them to do things for him (BLAIR) and makes them promises."   VICTIM 4 added that this behavior "is just not right."   VICTIM 4 further stated that "Its not nobody that needs to be at the courthouse, giving people sentences and time and got their life in his hands."

113.   VICTIM 4 further advised that he or she provided this complaint to his or her attorney and it was now suspected that BLAIR was presently aware of VICTIM 4's complaint.

114.   VICTIM 4 stated that he or she was directed by BLAIR to take a deal on a pending case and "everything would be fine."   However, as soon as VICTIM 4 said "no" to BLAIR'S requests and informed BLAIR that "I wasn't doing nothing else for him (BLAIR) I'm in jail."   Lastly, VICTIM 4 added "that if that's the way the system is supposed to work, then the whole system is broken, it just ain't right."   Before ending the

telephonic complaint VICTIM 4 positively identified the subject of his or complaint as being Scott Blair, the Commonwealth Attorney.

115.   At various relevant times, VICTIM 4, whose identity is known by this officer, was charged with criminal offenses within the 33rd Judicial Circuit, including the following:  On or about December 9, 2022, VICTIM 4 was charged in Perry Circuit Court (22-CR-00238) with a violation of K.R.S. 525.100 (Public Intoxication Controlled Substance, Excludes Alcohol), a Class B misdemeanor offense; K.R.S. 218A.1415 (Possession Controlled Substance 1st Degree 1st Offense Methamphetamine), a Class D felony offense; K.R.S. 218A.1417 (Possession Controlled Substance 3rd Degree Drug Unspecified), a Class A misdemeanor; K.R.S. 218A.1416 (Possession Controlled Substance 2nd Degree Drug Unspecified), a Class A misdemeanor; and K.R.S. 533.050 (Probation Violation for Felony Offense) (hereinafter, "Case D"). VICTIM 4 agreed to plead guilty in Case D, and on or about March 29, 2023, the Perry Circuit Court entered a judgment finding VICTIM 4 guilty of all charges.

116.   Thereafter, VICTIM 4 was sentenced to a suspended prison sentence for all charges and was mandated to complete a period of unsupervised probation for all of the aforementioned charges.   VICTIM 4 remained subject to the jurisdiction of the Perry Circuit Court, including that VICTIM 4 would abide by certain release conditions such as drug screenings and that VICTIM 4 would make appearances in court as ordered, and was subject to potential additional incarceration for violations of the Circuit Court's conditions and orders.

117.   A review of the pending court record for this pending Perry Circuit Case (via CourtNet) revealed that VICTIM 4 was sentenced for a Probation Violation Charge for a felony offense on March 05, 2024.

118.   A review of BLAIR'S Facebook records revealed that an account believed to belong to VICTIM 4 began chatting via Facebook Messenger with BLAIR in August of 2022. VICTIM 4's Facebook account appears in the return under the assumed name "Nick Bare."

119.   On or about August 20, 2022, BLAIR asked VICTIM 4, "What are you up to tonight?" to which VICTIM 4 responded, "Nothing much you?" Eventually, VICTIM 4 asked BLAIR "You want me over". BLAIR told Victim 4, he did want VICTIM 4 to come over and VICTIM 4 agreed to come in exchange for $50. BLAIR stated that he was confused because "It says [VICTIM 4] (referring to VICTIM 4 by his actual name) but it has a different name when I see your profile. This officer believes that Blair was attempting to utilize a payment app such as Venmo or CashApp to pay VICTIM 4, thus realizing that Nick Bare was in fact VICTIM 4.

120.   On or about April 9, 2024, an interview was conducted with VICTIM 4, who is currently housed at the Kentucky River Regional Jail in Hazard within Perry County, Kentucky. VICTIM 4 explained that he had known BLAIR for a long time, and had known that 15 to 20 years ago BLAIR had a drug problem and had to go to rehab.

121.   VICTIM 4 reported that in or about sometime in 2022, he was charged with Possession of a Controlled Substance and was shortly thereafter released on his own recognizance (OR). Not long after that, VICTIM 4 encountered BLAIR, whom VICTIM 4 knew to be the Commonwealth Attorney. VICTIM 4 stated that BLAIR told VICTIM

4, "I take care of my friends," VICTIM 4 explained that BLAIR took credit for allowing

VICTIM 4 to be released on his own recognizance.

122.    In or about June of 2022, VICTIM 4 again encountered BLAIR. On this

occasion, BLAIR told VICTIM 4 that he had added VICTIM 4 as a friend on Facebook

and that VICTIM 4 should accept his request. VICTIM 4 immediately obliged, and shortly

thereafter BLAIR sent VICTIM 4 a message instructing VICTIM 4 to come to BLAIR'S

home. VICTIM 4 eventually went to BLAIR'S home. VICTIM 4 described certain aspects

of BLAIR'S home, which this officer has confirmed are accurate.

123.    Upon arrival at BLAIR'S home, BLAIR sat VICTIM 4 down and told

VICTIM 4 that VICTIM 4 is in trouble and that his Possession of Controlled Substance

case will be indicted and will be "in front of" BLAIR. VICTIM 4 reported that BLAIR

then leaned back in his chair and said, "Do you want to go to prison? I am the person who

decides if you go to prison or not." BLAIR then explained, "I can help you if you do some

things for me, I need someone to do things that I can't do myself." BLAIR told VICTIM

4, "No one but you and I will know."

124.    BLAIR told VICTIM 4 that BLAIR uses methamphetamine and that

BLAIR needed VICTIM 4 to go and pick up methamphetamine for BLAIR. In exchange,

BLAIR would recommend probation and drug court for VICTIM 4 and make sure that

VICTIM 4 did not go to jail. VICTIM 4 reported that BLAIR instructed VICTIM 4 to

"self-indict" and then to plead guilty. VICTIM 4 complied and was given probation and

drug court. When asked if he felt like he could say no to BLAIR'S proposed arrangement,

VICTIM 4 stated that he did not think so.

125. In total, VICTIM 4 reported picking up methamphetamine for BLAIR on approximately 30 occasions. VICTIM 4 explained that sometimes BLAIR would prearrange and prepay the deals and VICTIM 4 would show up where BLAIR told him to and pick up prepackaged methamphetamine for BLAIR. Other times, BLAIR would provide VICTIM 4 with money and tell him to go to predetermined places to buy methamphetamine for BLAIR. On several occasions BLAIR just provided VICTIM 4 money and told him to go find methamphetamine. VICTIM 4 reported that when BLAIR wanted him to make a purchase on BLAIR'S behalf, BLAIR would either send him a Facebook message, a text message, or call him. VICTIM 4 reported that BLAIR had an iPhone that he always used to contact VICTIM 4.

126. After completing approximately five of these transactions for BLAIR, VICTIM 4 reported that he went to BLAIR'S house to make a delivery of methamphetamine for BLAIR. When VICTIM 4 knocked on the door, BLAIR answered the door wearing no clothes. VICTIM 4 entered and BLAIR walked behind VICTIM 4 standing between VICTIM 4 and the door. VICTIM 4 reported that BLAIR laid out two $100 bills and said, "[VICTIM 4], I probated you and now I want to suck your dick." VICTIM 4 reported that at first VICTIM 4 told BLAIR no, that he "wasn't like that." But, eventually, VICTIM 4 relented and allowed BLAIR to perform oral sex on him. VICTIM 4 reported that he felt he could not say no to BLAIR because of BLAIR'S position as his prosecutor and the consequences that might follow. After some time, VICTIM 4 reported that BLAIR would instruct him to go and pick up individuals for BLAIR to have sex with and bring those individuals to BLAIR'S home.

127.   VICTIM 4 confirmed that conversations with BLAIR in which BLAIR directed him to get drugs occurred on multiple electronic messaging services. VICTIM 4 further confirmed that he created the above mentioned "Nick Bare" account at the direction of BLAIR. VICTIM 4 stated that BLAIR was often paranoid and wanted VICTIM 4 to have a pseudonym account with which he only messaged BLAIR. On several occasions, VICTIM 4 remembered delivering methamphetamine to BLAIR at the old Perry County Courthouse, where BLAIR'S office is located, during work hours. VICTIM 4 further identified two other individuals with whom BLAIR has similar arrangements. Specifically, like VICTIM 4, those individuals agreed to "self indict", and were sentenced to probation or drug court in exchange for procuring drugs or providing sexual favors to BLAIR. VICTIM 4 stated that when BLAIR would call or message him to complete a task and VICTIM 4 would ignore the contact, BLAIR would reach out to one of the other individuals in similar arrangements with BLAIR.

128.   VICTIM 4 reported that eventually, he became uncomfortable with the arrangement with BLAIR and began to decline BLAIR'S demands. VICTIM 4 reported that eventually BLAIR turned on him and recommended he be terminated from drug court. VICTIM 4 was then sent back to jail for a probation violation, where he remains. As described above, relevant court documents confirm that VICTIM 4 was convicted of a probation violation in March of 2024.

129.   A further review of the Facebook return revealed a series of messages with an individual, whose identity is known to this officer, but is hereinafter referred to as VICTIM 5. BLAIR began communicating via Facebook Messenger in or about April of 2020 and continued communication through at least in or about April of 2022.

130. The messages reveal that BLAIR repeatedly attempted to convince VICTIM 5 to meet with BLAIR. Over the course of several months BLAIR asked VICTIM 5 to meet him on multiple occasions. One set of messages from on or about April 25, 2020 show BLAIR asking VICTIM 5, "Whats up today? Can you get away?" To which VICTIM 5 responded that he could meet up if he could get a babysitter for his child. BLAIR eventually encouraged VICTIM 5 to, "Try hard."

131. At one point, the conversation between BLAIR and VICTIM 5 became sexual in nature. On or about May 23, 2020, VICTIM 5 discussed with BLAIR an ongoing medical condition from which VICTIM 5 was suffering. VICTIM 5 stated, "I gotta go to the doc soon, where I broke my back 2 years ago I'm still miserable." BLAIR responded, "Still bothers you huh? That sux. When your back hurts you hurt all over." VICTIM 5 agreed, stating "Yeah the damp weather makes it worse." BLAIR, in turn, stated "All you'd have to do here is lay back and I'd do the rest. Lol." A short time later that same day, BLAIR again tries to convince VICTIM 5 to come and hang out with him by saying, "I promise it won't be weird or anything."

132. On or about January 11, 2021, VICTIM 5 sent BLAIR a series of messages about a speeding ticket VICTIM 5 had received. Seeking advice, VICTIM 5 said, "Man I got a ticket this morning, when I get ready to pay it do I come to your office or go to the clerk?" BLAIR responded, "Clerk . . . My office doesn't do the tickets. If we did I'd take care of it. The county attorney does. I bet if you go to court the judge will divert it." Eventually, VICTIM 5 agrees that he will go to court for the ticket. BLAIR immediately responded, "Ok. Cool. Now for that good advice…I'd still like to meet up. Lol. Jk. (just kidding). I would like to hang some time still."

133.   On or about February 7, 2022, VICTIM 5 sent BLAIR a message via Facebook Messenger, stating "I have an important question, I'm in trouble and you would know. I got a script for suboxone but never got it approved where I'm on probation. Kevin (believed by this officer to be Kevin Johnson, a defense attorney) is gonna file a motion for me. I just need some advice." BLAIR responded, "Ok. I won't object. When is he filing the motion for?" VICTIM 5 then informs Blair it will be the following week.

134.   On or about the same day, VICTIM 5 sent a message to BLAIR which said, "Another thing though is I took a gabapentin and it's gonna show up in the lab . . . I just got lab bed [sic] this morning. Where I haven't been in trouble in 4 years what would the judge do to me over gabapentin?" BLAIR responded, "I don't know if probation and parole will arrest you but if so it should only be until they bring you to court at the longest. I won't recommend that they revoke your probation." VICTIM 5 then asks BLAIR if VICTIM 5 can call BLAIR to talk about it, and BLAIR provides his cell phone number and a time that BLAIR was available to talk.

135.   On or about the same day, but several hours later, VICTIM 5 again messaged BLAIR via Facebook messenger expressing concern about the drug test, stating " . . . if it came down to jail time would the judge consider house arrest?" BLAIR responded. "I promise I won't recommend jail time. You have my word."

136.   A review of relevant court dockets revealed that VICTIM 5 was serving a term of felony probation for a 2017 case in Perry County during the period of time in which the above conversations occurred. A further review revealed that, consistent with the messages, on or about February 18, 2022, a motion was filed on behalf of VICTIM 5 to modify the terms of probation to allow VICTIM 5 to take certain medications. On or

about February 28, 2022, the Defendant is granted permission by the court to specifically take gabapentin. Further review reveals that VICTIM 5's probation was not violated at that time.

137.   Based on the foregoing, Affiant submits there is probable cause to believe that BLAIR used Facebook Messenger to knowingly deprive the citizens of Perry County of their right to the honest services of their elected Commonwealth Attorney through a pattern of taking favorable action for defendants in pending criminal cases before him in exchange for sex acts, methamphetamine, and/or the delivery of methamphetamine, in violation of 18 U.S.C. §§ 1343 and 1346.

_Zach Bryson by EBA with permission_
Zachary Bryson, Task Force Officer
Federal Bureau of Investigation

Sworn to before me this __10__ day of April, 2024

_____
Honorable Edward B. Atkins
United States Magistrate Judge
Eastern District of Kentucky

Signed By:
Edward B. Atkins _EBA_
United States Magistrate Judge